David S. Casey, Jr., SBN 060768
dcasey@cglaw.com
Gayle M. Blatt, SBN 122048
gmb@cglaw.com
P. Camille Guerra, SBN 326546
camille@cglaw.com
**CASEY GERRY FRANCAVILLA BLATT LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO / OAKLAND DIVISION**

| | |
|---|---|
| JANICE ELLIOT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PROSPER FUNDING, LLC, and PROSPER MARKETPLACE, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Janice Elliot ("Plaintiff"), by and through the undersigned counsel, files this Class Action Complaint individually and on behalf of the class defined below of similarly situated persons ("Class Members"), against Prosper Funding, LLC ("Prosper Funding") and Prosper Marketplace, Inc. ("Prosper Marketplace") (collectively "Defendants"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and her own personal knowledge.

## SUMMARY OF THE ACTION

1. Plaintiff brings this class action against Defendants for their failure to properly protect, safeguard, and maintain the privacy and security of the personally identifying information ("PII" or "Private Information") of Plaintiff and millions of other individuals—including borrowers and investors—whose data was entrusted to Defendants. The compromised PII includes, without limitation, names, Social Security numbers, dates of birth, government identification numbers, addresses, income and employment data, and other sensitive personal and financial information.

2. Defendant Prosper Marketplace offers online financial services through which people seeking personal financing or home equity loans ("borrowers") can obtain consumer loans that are ultimately funded by third parties. Instead of acting as a traditional lender, Prosper provides a digital marketplace where loan applicants provide the personal and financial details necessary to quality for credit, and where outside investors, ranging from individuals to large institutions, supply money to support portions of those loans in exchange for repayment with interest.

3. Defendant Prosper Funding is a subsidiary of Defendant Prosper Marketplace. Prosper Funding supports and administers the loan transactions made available through the marketplace and oversees the investor–borrower relationships that result from those transactions.

4. Participation in Prosper's financial marketplace requires the transmission of highly sensitive datasets to Defendants' systems. Borrowers are compelled to submit identity credentials, such as Social Security numbers, dates of birth, and full names, employment and income information, and other credit-related metrics that enable Defendants to perform risk scoring and underwriting. Investors likewise must provide Social Security numbers, tax-reporting identifiers, bank-account routing information, and other data required for anti-money-laundering compliance.

5. Defendants aggregated and processed this PII within centralized data repositories and backend infrastructure under their sole administrative control. By collecting and retaining this

information, Defendants established a custodial and operational duty to deploy robust, industry-standard cybersecurity controls—including encryption, access segmentation, intrusion detection, and continuous monitoring—to mitigate foreseeable risks of unauthorized access, exfiltration, and exploitation of the PII entrusted to them.

6. Defendants expressly assured platform users that they would use "physical, technical (electronic) and operational" safeguards to secure Plaintiff's and Class Members' Private Information in their published privacy policy.[1] Defendants further represented that their users' PII is "tightly controlled and protected" from any unauthorized access.[2]

7. Notwithstanding these representations—and despite their obligations under federal and state data-protection laws and industry security standards—Defendants discovered on or about September 1, 2025, that malicious actors had successfully penetrated Prosper's network environment. The intruders obtained unauthorized access to backend systems containing borrower and investor records and exfiltrated large volumes of sensitive PII, resulting in a widespread data-compromise event (the "Data Breach").

8. Even after confirming that cybercriminals had accessed and extracted borrowers' and investors' PII from their systems, Defendants did not issue notifications to impacted individuals until September 17, 2025, nearly two weeks after identifying the breach activity. During this period of nondisclosure, users did not have the opportunity to take steps to protect their compromised PII from being fraudulently used.

9. Defendants' inadequate implementation of required data-security controls—such as proper network hardening, access governance, and monitoring—left the PII of Plaintiff and Class Members exposed to exploitation. These deficiencies created avoidable vulnerabilities within Defendants' systems that threat actors were able to identify and leverage to execute the intrusion.

10. Defendants have long understood that the information they collect and retain—including highly sensitive identifiers such as Social Security numbers and financial-account credentials—carries substantial monetary value on the criminal market and are difficult to change

[1] *Prosper Privacy Policy & Federal Privacy Notice*, PROSPER, https://www.prosper.com/legal/privacy-policy (last accessed Dec. 5, 2025).
[2] *Id.*

once compromised. Despite this knowledge, Defendants failed to deploy the heightened data-protection measures necessary to secure such high-value PII against foreseeable cyber threats.

11. When hackers obtain PII of the type compromised here, they can correlate that data with information acquired from other breaches, public records, or illicit databases to create comprehensive identity profiles of their victims. These identity kits enable perpetrators to commit numerous forms of financial and governmental fraud, including but not limited to:

- establishing new credit lines
- taking out loans
- siphoning funds from existing accounts
- filing fraudulent tax returns
- securing government benefits, and
- manufacturing synthetic identities

12. Such misuse routinely occurs long before the impacted individual becomes aware that their credentials have been exploited. Each incident of identity fraud can inflict severe and lasting harm—destroying creditworthiness, destabilizing financial conditions, and compromising personal safety—often requiring years of remediation efforts with no guarantee of full recovery.

13. Defendants knew or should have known that their security environment lacked the safeguards necessary to defend against such a breach. Given the sensitivity and volume of PII stored on their platform, coupled with the well-documented escalation of ransomware operations, credential-harvesting campaigns, and other attacks aimed at financial-technology providers, a compromise of Defendants' systems was not only foreseeable but highly predictable.

14. The Data Breach occurred as a direct and proximate result of Defendants' failure to properly secure, manage, and safeguard the PII entrusted to them by Plaintiff and Class Members. Defendants did not employ the level of cybersecurity architecture, controls, and maintenance required to defend their network against reasonably anticipated intrusion attempts. As a consequence of these preventable security lapses, malicious actors were able to compromise and extract Plaintiff's and Class Members' highly sensitive PII.

15. Had Defendants deployed security measures aligned with well-established industry frameworks and best practices—as they publicly represented they had done—the intrusion likely

would have been detected, contained, or prevented altogether. Because those protections were not in place, Plaintiff and Class Members now face an ongoing and materially heightened likelihood of identity fraud, account takeovers, and other misuse of their personal data—risks that persist indefinitely due to the immutable nature of much of the compromised information. As a result, Plaintiff and Class Members must expend considerable time, financial resources, and vigilance to monitor their credit, secure their accounts, and otherwise mitigate the continuing threat posed by the unauthorized dissemination of their PII.

16. Plaintiff, on behalf of herself and all others similarly situated, herein alleges claims for negligence, breach of implied contract, and unjust enrichment. Plaintiff on behalf of herself and the Class, seeks: (i) actual damages, economic damages, statutory damages, and nominal damages; (ii) punitive damages; (iii) fees and costs of litigation; (iv) injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII in Defendants' custody, care, and control in order to prevent incidents like the Data Breach from recurring in the future and for Defendants to provide long-term identity theft protective services to Plaintiff and Class Members; and (v) such other relief as the Court deems just and proper.

## PARTIES

### A. Plaintiff

17. Plaintiff Janice Elliot is a resident and citizen of Mesquite, Texas. Since approximately 2022, Plaintiff has utilized Defendants' lending platform, including applying for and obtaining consumer and home-related loans through their services.

### B. Defendants

18. Defendant Prosper Funding, LLC is a California limited liability company with its principal place of business located in 221 Main Street, 3rd Floor, San Francisco, California 94105.

19. Defendant Prosper Marketplace is a corporation organized under laws of Delaware, with its principal place of business located at 221 Main Street, 3rd Floor, San Francisco, California 94105.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because this is a class action

in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs, there are more than 100 proposed Class Members, and minimal diversity exists as Defendants are citizens of states different from that of at least one Class Member.

21. This Court has general personal jurisdiction over Defendants because they maintain their principal place of business in San Francisco, California, regularly conduct business in California, and have sufficient minimum contacts in California, such as to not offend traditional notions of fair play and substantial justice.

22. Venue in this District is proper under 28 U.S.C. § 1391 because Defendants reside in this District and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, including Defendants collecting or storing the PII of Plaintiff and the putative Class Members.

23. Divisional Assignment: This action arises in San Francisco County, where Defendants are headquartered and where a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred. Pursuant to Civil Local Rule 3-2(d) of the United States District Court for the Northern District of California, all civil actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

### A. Defendants Collected, Stored, and Maintained Personally Identifiable Information

24. Established in 2005, Prosper Marketplace, Inc., together with its subsidiary Prosper Funding, LLC, operates a technology-driven, peer-to-peer ("P2P") lending marketplace that was among the earliest P2P platforms to emerge in the United States. Rather than functioning as a traditional bank, Prosper utilizes a digital-platform model that facilitates the origination of consumer credit products—including personal loans and home-equity financing—through fully online workflows. Capital for those loans is supplied by external funding sources, ranging from individual retail investors to sophisticated institutional participants, who purchase fractional exposures to the credit assets and receive scheduled principal and interest distributions in return.

25. Prosper's platform infrastructure supports the full lifecycle of the consumer-credit transactions it enables—ranging from intake and automated evaluation of borrower applications, to

credit-risk analytics, origination workflows, servicing operations, and allocation of repayment flows to participating investors. To perform these functions, Defendants collect and maintain large volumes of sensitive personal and financial data from both sides of the marketplace, which they store within their centralized information systems and service environments.

26. Borrowers are required to provide sensitive personal and financial data, including names, addresses, email addresses, telephone numbers, dates of birth, Social Security numbers, income and employment information, and bank-account details. Investors must likewise provide identifying and financial information, such as names, addresses, Social Security or tax-identification numbers, and linked bank-account information, to verify their identities and comply with federal tax-reporting and anti-money-laundering laws.[3]

27. Plaintiff and Class Members are and/or were customers who used Defendants' financial-technology services—whether to obtain consumer credit or to fund loans—and, in doing so, were required to furnish Defendants with highly sensitive PII. They did so with the reasonable understanding that Defendants would implement and maintain appropriate, industry-standard cybersecurity measures to ensure that their confidential information remained protected from unauthorized access or misuse.

28. Prosper Funding markets its platform as highly secure, telling users that "[e]nsuring that Prosper is private and safe is our highest priority" and that their information "is kept in a state-of-the-art data center. Physical access is strictly controlled and we use the latest in threat prevention technologies including the very best in firewall, VPN, antivirus, Web filtering and antispam technologies."[4] In addition, Prosper states that it adheres to "rigid privacy policy" with "very strict guidelines to protect your privacy," emphasizing that "Prosper does not sell, rent, or share your personal information with third parties for their marketing purposes."[5]

29. Despite these representations, Defendants did not implement or maintain the level of security necessary to protect their systems against well-known and predictable cyber threats. As a

---

[3] Prosper Privacy Policy & Federal Privacy Notice, *available at* https://www.prosper.com/about (last accessed Dec. 5, 2025).
[4] *Security and Privacy at Prosper*, Prosper Funding, LLC, https://www.prosper.com/legal/security (last visited Dec. 5, 2025).
[5] *Id.*

result of these security deficiencies, malicious actors were able to access and extract the highly sensitive PII of Plaintiff and Class Members, exposing them to significant and enduring harm.

**B. The Data Breach Exposed Valuable PII**

30. On September 1, 2025, Defendants revealed that they had "identified that an unauthorized third party gained access to the Company's systems that contain proprietary and confidential information." Defendants also acknowledged that there was "evidence that confidential, proprietary, and personal information, including Social Security numbers, was obtained, including through unauthorized queries made on Company databases that store customer and applicant data."[6]

31. These admissions confirm that cybercriminals were able to infiltrate Defendants' internal systems and retrieve sensitive data belonging to Plaintiff and Class Members.

32. As reflected in Defendants' Form 8-K, the Company advised the U.S. Securities and Exchange Commission on September 17, 2025, that its forensic review was still underway at that time. In that report, Defendants acknowledged that the intrusion involved "unauthorized queries" of internal databases housing customer and applicant information.[7] Although Defendants have not publicly disclosed the precise number of impacted individuals, cybersecurity researchers analyzing the leaked materials have estimated that roughly 17.6 million distinct email addresses, along with related PII, were compromised in the incident.[8]

33. Defendants issued a public statement on September 17, 2025, acknowledging the security incident and referring affected customers to its designated breach-response resources for additional details and assistance.[9] Defendants also indicated that they had alerted law-enforcement authorities and begun issuing notifications to affected individuals in accordance with applicable state

[6] Prosper Funding LLC & Prosper Marketplace, Inc., Current Report (Form 8-K) Item 8.01 (Dec. 5, 2025), available at https://www.sec.gov/Archives/edgar/data/1542574/000141626525000038/prosper-20250901.htm [hereinafter "Prosper Form 8-K"].

[7] *Id.*

[8] Ionut Arghire, *Prosper Data Breach Impacts 17.6 Million Accounts*, SecurityWeek (Dec. 5, 2025), https://www.securityweek.com/prosper-data-breach-impacts-17-6-million-accounts/; *Have I Been Pwned: Prosper Data Breach Impacts 17.6 Million Accounts*, Have I Been Pwned (Dec. 5, 2025), https://haveibeenpwned.com/Breach/Prosper; Connor Jones, *Have I Been Pwned Logs 17.6 M Victims in Prosper Breach*, The Register (Dec. 5, 2025), https://www.theregister.com/2025/10/17/prosper_breach/.

[9] Prosper Form 8-K, supra note 1.

data-breach laws and reporting obligations.

34. As detailed in Defendants' disclosures and corroborated by third-party forensic examinations, the information accessed during the breach consisted of highly sensitive personal and financial data including personal information such as names, addresses, dates of birth, and Social Security numbers, as well as other information provided during loan applications and investor onboarding.[10] Both sides of Defendants' marketplace were impacted: borrowers seeking credit products and investors providing funding, each of whom had provided their sensitive PII and financial information to Defendants.

35. Available reporting indicates that the stolen data consisted of a broad range of personal and financial attributes, including individuals' names, residential addresses, dates of birth, Social Security numbers, and—in certain cases—details reflecting creditworthiness, employment, and income. Investigators have further noted that the compromised database involved data for both borrower and investor participants, many of whom were required to supply highly sensitive financial and tax-related information to satisfy identity-verification, lending-eligibility, and federal AML compliance obligations.[11]

36. Although Defendants owed—and expressly undertook—responsibilities to implement robust data-security safeguards, they did not employ the protections that are widely recognized as necessary to secure the highly sensitive PII in their custody. The occurrence of the Data Breach itself demonstrates that Defendants' security controls were materially deficient.

37. Moreover, Defendants' breach notification provided minimal transparency, omitting critical details such as the attack vector, how long the intruders had access, who perpetrated the intrusion, and what specific remediation measures were being deployed to strengthen system defenses going forward.

38. Absent this information, impacted individuals are left without the knowledge required to fully assess the risks they now face or take all necessary steps to guard against continued misuse of their personal data.

---

[10] *Id.*: see also Arghire, supra note 3 (reporting exposed dataset contained PII including names, birthdates, and Social Security numbers).

[11] *Id.: Over 17 Million Victims Reported in Huge Prosper Data Breach — Here's What We Know So Far*, TechRadar (Dec. 5, 2025), https://www.techradar.com/pro/security/over-17-million-victims-reported-in-huge-prosper-data-breach-heres-what-we-know-so-far.

39. Based on Defendants' disclosures, the purpose of the cyberattack was to penetrate Defendants' internal environment and extract sensitive PII belonging to borrowers and investors—including Plaintiff and members of the Class—which the threat actors were ultimately successful in obtaining.

40. Upon information and belief, a vast number of individuals had their confidential and private information accessed in the Data Breach, with the compromised population numbering in the millions.

41. The Data Breach was the foreseeable consequence of Defendants' failure to deploy and maintain the cybersecurity controls necessary to protect the highly sensitive information entrusted to them. Had Defendants implemented appropriate safeguards consistent with industry standards, the Data Breach would likely have been prevented.

### C. Defendants Were Aware of the Significant Cyber Risks Inherent in Their FinTech Operations, Yet Failed to Adequately Protect PII

42. Defendants were, at all times, aware—or reasonably should have been aware—that the highly sensitive PII stored within their systems represented a prime target for cybercriminals. The nature, volume, and concentration of confidential PII maintained on Defendants' networks made their platform an attractive and lucrative objective for threat actors, and any unauthorized access posed serious risks to a large population of affected individuals.

43. By accepting and storing Plaintiff's and Class Members' personal data, Defendants assumed responsibility for safeguarding that information and protecting it against unauthorized compromise. Defendants also knew, or reasonably should have recognized, that a breach of this data would have severe and foreseeable consequences for the individuals whose PII was entrusted to them.

44. Data collected by Consumer Financial Protection Bureau ("CFPB") and industry-wide reporting reflects that identity-theft and data-breach complaints have surged in recent years — underscoring that PII such as Social Security numbers and financial account information is widely regarded as valuable and routinely targeted by criminals.

45. The Federal Trade Commission has warned consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[12]

46. In April 2020, ZDNet reported that "ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[13]

47. With stolen PII of the kind compromised here, cybercriminals can perpetrate a wide range of fraudulent schemes. For example, threat actors may use a victim's name and Social Security number to secure loans or open new lines of credit, claim government benefits, or file fraudulent tax returns to steal refunds. They may also obtain employment or housing under the victim's identity, or even present the victim's information to law enforcement during an arrest — potentially causing warrants or criminal records to be issued in the victim's name. In some instances, criminals can even acquire state identification or driver's licenses bearing their own photographs but linked to the victim's identity credentials. Each of these misuses can inflict severe personal, financial, and legal consequences on the victim.[14]

48. Given the rapid escalation of sophisticated cyber intrusions targeting financial-technology and other data-driven enterprises, Defendants' obligation to maintain rigorous security controls was especially critical. The growing frequency and severity of attacks across the industry made robust protection of Plaintiff's and Class Members' information an indispensable component of Defendants' operations.

49. Defendants were also well aware—or, at minimum, reasonably should have been—that large financial-services organizations like theirs are consistently targeted by ransomware groups and other criminal threat actors. Defendants therefore knew that Plaintiff's and Class Members' PII

---

[12] *See* What to Know About Identity Theft, FEDERAL TRADE COMMISSION (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Dec. 5, 2025).

[13] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Dec. 5, 2025).

[14] *See* Warning Signs of Identity Theft, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Dec. 6, 2025).

faced a foreseeable danger of unauthorized access, theft, and eventual dissemination if their systems were not properly secured.

### D. Defendants' Failure to Maintain Reasonable Security by not Adhering to Regulatory Requirements and Best-Practice Cybersecurity Protocols Constitutes a Breach of Their Duties to Plaintiff and Class Members

50. By collecting and storing Plaintiff's and Class Members' sensitive personal information, Defendants assumed a duty to use reasonable and industry-appropriate data-security practices to protect that information from unauthorized access, theft, or misuse. This duty included implementing commercially accepted safeguards, monitoring their environment for intrusion attempts, and promptly detecting and responding to suspicious activity within their systems. Defendants were also obligated to protect the PII because they knew the information was extremely valuable to cybercriminals and that their role as a major financial-technology platform made them a likely target for attack. Moreover, Defendants were aware—based on longstanding trends in cybercrime and their own representations—that a data breach involving such PII would expose victims to serious and foreseeable harm, reinforcing their responsibility to maintain robust protections at all times.

51. Organizations that collect and maintain sensitive personal information—particularly within the financial-technology sector—are expected to adhere to well-recognized data-security standards. These commonly accepted practices include, but are not limited to, the following safeguards:

i. Maintaining a secure firewall configuration;

ii. Monitoring for suspicious or irregular traffic to servers or networks;

iii. Monitoring for suspicious credentials used to access servers or networks;

iv. Monitoring for suspicious or irregular activity by known users;

v. Monitoring for suspicious or unknown users;

vi. Monitoring for suspicious or irregular server requests;

vii. Monitoring for server requests for PII;

viii. Monitoring for server requests from VPNs; and

ix. Monitoring for server requests for Tor exit nodes.

52. The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[15] and protection of PII which includes basic security standards applicable to all types of businesses.[16]

53. The FTC recommends that businesses:

i. Identify all connections to the computers where sensitive information is stored.

ii. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

iii. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

iv. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

v. Pay particular attention to the security of their web applications, the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

vi. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

vii. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access control settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since

[15] Start with Security: A Guide for Business, FTC (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf. (last accessed Dec. 5, 2025)

[16] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf. (last accessed Dec. 5, 2025)

the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

viii. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

ix. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business network, the transmission should be investigated to make sure it is authorized.

54. As described further below, Defendants owed a duty to safeguard PII under the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act") to ensure that all information they received, maintained, and stored was secure. This statute was enacted to protect Plaintiff and the Class Members from the type of conduct in which Defendants engaged, and the resulting harms Defendants proximately caused Plaintiff and the Class Members.

55. The FTC Act, requires companies, like Defendants, who collect and store consumer data to employ reasonable and appropriate measures to secure such information from unauthorized access and misuse. Defendants therefore had a statutory obligation to ensure that the systems housing Plaintiff's and Class Members' PII were properly designed, maintained, and safeguarded.

56. Defendants breached that obligation, as well as their general duty of care, by failing to implement sufficient cybersecurity protections to secure Plaintiff's and Class Members' confidential information. Among other failures, Defendants did not adequately encrypt or otherwise obfuscate sensitive identifiers, neglected to properly restrict or monitor access to databases containing PII, utilized outdated and ineffective security tools, and did not institute appropriate detection and response mechanisms capable of promptly identifying intrusions. These deficiencies allowed unauthorized actors to penetrate Defendants' systems and extract confidential data. Defendants' conduct fell below widely recognized industry standards and constituted an unfair and unlawful practice under the FTC Act.

57. Had Defendants employed proper data-security controls and exercised reasonable diligence in maintaining their systems, the intrusion would likely have been detected earlier or

prevented entirely. The Data Breach occurred only because Defendants did not fulfill their security responsibilities.

58. Defendants also had an affirmative duty to provide timely and transparent notice to individuals whose PII was compromised. Prompt disclosure is necessary to allow victims to mitigate harms such as identity fraud and financial loss. By delaying and withholding critical information, Defendants exacerbated the risk and extent of harm suffered by Plaintiff and Class Members and directly contributed to the injuries that continue to unfold.

**E. <u>Plaintiff's Specific Allegations</u>**

***Plaintiff Janice Elliott***

59. Plaintiff Janice Elliott resides in Texas and has been a Prosper loan customer since around 2022, having obtained personal and home-related financing through Defendants' platform.

60. To secure those loans, Plaintiff was required to provide Defendants with numerous sensitive identifiers, including her full name, residential information, date of birth, and Social Security number. Plaintiff continues to manage her Prosper loan accounts through Defendants' online system.

61. Plaintiff provided this sensitive PII with the understanding and expectation that Defendants would safeguard it. She relied on Defendants' assurances that they employed strong "physical, technical, and operational safeguards" and reasonably believed that Defendants complied with applicable industry standards and data-security regulations in protecting borrowers' PII.

62. In or about September 2025, Plaintiff received a notice alerting her that Defendants' systems had been compromised.

63. Learning that her Social Security number and other core identity elements had been compromised caused Plaintiff considerable shock, frustration, and concern.

64. Following the notification, Plaintiff undertook time-consuming efforts to understand the nature of the breach and its impact, including reviewing the disclosures, researching the incident online, contacting Prosper support representatives, and increasing surveillance of her credit and financial accounts to guard against unauthorized activity.

65. Around September 29, 2025, Plaintiff contacted Defendants by email seeking further information about the Data Breach. Defendants replied that "[w]e have evidence that confidential,

proprietary, and personal information, including Social Security Numbers, was obtained, including through unauthorized queries made on Company databases that store customer information and applicant data. We will be offering free credit monitoring as appropriate after we determine what data was affected." See Ex. A.

66. Despite her inquiry in September, Defendants have not provided Plaintiff with any further meaningful information about the Data Breach, leaving her unaware of precisely what personal data was compromised, how the unauthorized access occurred, and what additional security measures — if any — have since been implemented.

67. As a proximate result of the Data Breach, Plaintiff must continue expending substantial time and effort going forward to protect herself from identity-related harm. This ongoing vigilance — including monitoring for new accounts, fraudulent credit activity, and potential tax-fraud schemes — results in continued loss of time and disruption of daily life.

68. Plaintiff has experienced significant anxiety and emotional distress from knowing her most sensitive identifiers have been stolen and may be actively traded or misused by malicious actors. This fear and mental anguish represent legally cognizable harm.

69. Plaintiff also suffered actual economic and privacy injuries, including the loss of the confidentiality and market value of her personal information — a form of intangible property. Her PII was no longer secure as a result of Defendants' inadequate security practices.

70. As a direct and proximate result of the breach, Plaintiff faces an imminent and elevated risk of identity theft, fraudulent account openings, and misuse of her financial data by unauthorized third parties. Because Social Security numbers and other immutable identifiers cannot be changed, the harm to Plaintiff is ongoing and permanent.

71. Plaintiff has a continuing and personal interest in ensuring that her PII, which remains in Defendants' possession, is adequately protected from future unauthorized access or disclosure.

72. Defendants' delayed notification deprived Plaintiff of the chance to immediately implement protective measures. By failing to disclose the breach until September 17, 2025, despite detecting unauthorized access weeks earlier, Defendants increased the likelihood that criminals could exploit her information before she learned of the exposure.

### F. Plaintiff and the Class Have Suffered Injury-In-Fact and Are at Substantial Risk of Future Harm

73. As a proximate result of Defendants' inadequate security practices, cybercriminals were able to obtain the sensitive PII of Plaintiff and the Class. This stolen information has substantial monetary value in criminal markets, and its exposure imposes direct and ongoing costs on Plaintiff and the Class. On the dark web—an underground Internet black market—criminals openly buy and sell stolen PII to create "identity kits" worth up to $2,000 each that can be used to create fake IDs, gain access to bank accounts, social media accounts, and credit cards, file false insurance claims or tax returns, or rack up other kinds of expenses.[17] And, "[t]he damage to affected [persons] may never be undone."[18]

74. Data breaches involving Social Security numbers and other permanent identifiers are fundamentally different from payment-card compromises. When only a credit card number is stolen, the threat can be eliminated quickly by canceling the card. But when identity thieves gain access to core identity data, they can establish entirely new financial accounts, impersonate victims in government or employment settings, and otherwise misuse the stolen identity long into the future. Criminals often hold onto such data until victims are less vigilant and then exploit it without warning, causing substantial financial loss and consuming large amounts of a victim's time. The U.S. Department of Justice has reported that in 2021, identity theft victims spent on average about four hours to resolve problems stemming therefrom and that the average financial loss experienced by an identity theft victim was $1,160 per person.[19] Additionally, about 80% of identity theft victims reported some form of emotional distress resulting from the incident.[20]

75. When sensitive identifiers are compromised, the resulting harm can disrupt nearly every aspect of a person's financial life. Fraudulent activity can unfold quietly — credit reputations can be damaged long before the victim becomes aware, leaving individuals suddenly unable to

---

[17] Nick Culbertson, *Increased Cyberattacks on Healthcare Institutions Shows the Need for Greater Cybersecurity* (Jun. 7, 2021), FORBES, https://www.forbes.com/sites/forbestechcouncil/2021/06/07/increased-cyberattacks-on-healthcare-institutions-shows-the-need-for-greater-cybersecurity/?sh=ca928c05650d. (last accessed Dec. 6, 2025)

[18] *Id.*

[19] Erika Harrell and Alexandra Thompson, Victims of Identity Theft, 2021, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS (Oct. 2023), *available at* https://bjs.ojp.gov/document/vit21.pdf. (last accessed Dec. 7, 2025)

[20] *Id.*

qualify for loans, open accounts, or access routine financial services. Identity thieves may also divert tax refunds or trigger governmental audits by filing returns under the victim's name. Even the precautions recommended by experts to reduce future risk can introduce major burdens: placing fraud alerts or credit freezes often slows or blocks ordinary transactions, including leasing a vehicle, securing student financing, or completing major purchases like a home. The lasting nature of identity misuse means that victims may be forced to navigate these obstacles for years.

## CLASS ACTION ALLEGATIONS

76. Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), and where applicable, 23(c)(4), Plaintiff seeks certification of the following Nationwide Class (the "Class"):

> **Nationwide Class:** All persons in the United States who were impacted by the Prosper Data Breach, including all persons who were sent notice by Prosper that their Personal Information was compromised as a result of the Data Breach (and each person a "Class Member").

77. Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

78. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and 23(b)(3), and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

79. *Numerosity Under Rule 23(a)(1)*. The Class is so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all members of the Class in a single action will provide substantial benefits to the parties and the Court. Upon information and belief, Plaintiff estimates that the Class is comprised of millions of Class Members. The Class is sufficiently numerous to warrant certification.

80. *Commonality Under Rule 23(a)(2)*. Common legal and factual questions exist that predominate over any questions affecting only individual members of the Class. These common

questions, which do not vary among members of the Class, and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a. Whether Defendants knew or should have known that their computer systems and networks were vulnerable to unauthorized third-party access or a cyberattack;

b. Whether Defendants failed to utilize and maintain adequate and reasonable security and preventive measures to ensure that their computer systems and networks were protected;

c. Whether Defendants failed to take available steps to prevent and stop the Data Breach from occurring;

d. Whether Defendants failed to comply with their own policies and applicable laws, regulations and industry standards relating to data security;

e. Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their PII;

f. Whether Defendants breached any duty to protect the PII of Plaintiff and Class Members by failing to exercise due care in protecting their sensitive and private information;

g. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the breach of their systems, resulting in the loss of the PII of Plaintiff and Class Members.

h. Whether Defendants provided timely, accurate, and sufficient notice of the Data Breach to Plaintiff and the Class Members;

i. Whether Plaintiff and Class Members have been damaged by the wrongs alleged and are entitled to actual, statutory, or other forms of damages and other monetary relief; and

j. Whether Plaintiff and Class Members are entitled to injunctive or equitable relief, including restitution.

81. *Typicality Under Rule 23(a)(3)*. Plaintiff's claims are typical of the claims of the Class. Plaintiff had her PII compromised in the Data Breach. Defendants' uniformly unlawful course of conduct injured Plaintiff and Class Members.

82. *Adequacy of Representation Under Rule 23(a)(4)*. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and consumer

protection class action matters such as this action, and Plaintiff and her counsel intend to vigorously prosecute this action for the Class's benefit and have the resources to do so. Plaintiff and her counsel have no interests adverse to those of the other members of the Class.

83. _Predominance and Superiority_. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of each Class Member's claim is impracticable. The damages, harm, and losses suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Even if each Class Member could afford individual litigation, the Court system could not. It would be unduly burdensome if tens of thousands or more individual cases proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those individuals with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the Courts because it requires individual resolution of common legal and factual questions. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

84. As a result of the foregoing, class treatment under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and (c)(4) is appropriate.

## FIRST CAUSE OF ACTION

**Negligence**

***(On Behalf of Plaintiff and the Nationwide Class)***

85. Plaintiff incorporates the above allegations as if fully set forth herein.

86. By collecting, storing, and controlling highly sensitive personal information, Defendants undertook a legal duty to use commercially reasonable and industry-accepted security measures to protect that data from unauthorized access, theft, or misuse. This duty existed separate and apart from any contractual relationship and required Defendants to employ sufficient safeguards to prevent and promptly detect cyber intrusions such as the Data Breach.

87. Defendants knew, or should have known, of the growing risks associated with maintaining large repositories of PII, including escalating ransomware campaigns and frequent

attacks against financial-technology platforms. Because a security failure would foreseeably expose borrowers and investors to severe harms, Defendants owed a duty of care grounded in common law, industry norms, and their own representations regarding cybersecurity.

88. Defendants nonetheless disregarded the security and confidentiality of Plaintiff's and Class Members' data by failing to properly manage, supervise, and restrict the manner in which PII was stored, accessed, and transmitted. Their conduct amounted to reckless indifference to the safety of the information entrusted to them.

89. Defendants further owed a duty to Plaintiff and Class Members to provide accurate and timely notification of any data compromise so that impacted individuals could take protective measures, including securing accounts, monitoring for fraud, and implementing credit protections. Without such disclosure, victims are deprived of the ability to mitigate harm.

90. Under common-law principles requiring entities to prevent foreseeable harm, Defendants were obligated to safeguard the extraordinarily sensitive data they possessed. Defendants knew the PII was a prime target for criminal exploitation and that failure to secure it would threaten Plaintiff and the Class with immediate and long-term harm.

91. Defendants breached their obligations by failing to implement reasonable and modern data-security controls, including adequate access restrictions, network monitoring, encryption, data-minimization practices, and intrusion-detection measures. These lapses enabled cybercriminals to infiltrate Defendants' systems and extract Plaintiff's and Class Members' information.

92. Defendants' duty of care also arose pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), under which Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

93. The protections mandated by the FTC Act exist to prevent exactly the kinds of harms that occurred here and to shield consumers like Plaintiff and the Class from data-security misconduct.

94. Because the FTC Act is designed to safeguard PII and prevent resulting injury, Defendants' violations constitute negligence per se with respect to the duty and breach elements of Plaintiff's negligence claim.

95. Defendants failed to exercise reasonable care by using obsolete and ineffective safeguards, leaving highly valuable PII exposed, failing to monitor systems for suspicious activity, failing to encrypt or anonymize data, retaining PII longer than necessary, and allowing unauthorized individuals to access and exfiltrate confidential information. These failures also amount to unlawful conduct under the FTC Act.

96. Defendants additionally breached their duties by delaying disclosure of the Data Breach, worsening the harm and preventing Plaintiff and Class Members from taking timely protective action such as credit freezes, identity-protection services, and heightened account monitoring.

97. Defendants' failure to adopt and maintain reasonable data-security controls is a direct breach of their legal obligations.

98. Plaintiff and Class Members lacked any means to secure their own PII once Defendants obtained it. Defendants alone had the knowledge, ability, and responsibility to do so.

99. But for Defendants' negligent failure to safeguard their systems, Plaintiff's and Class Members' PII would not have been stolen. There is a direct and foreseeable causal connection between Defendants' inadequate cybersecurity, the resulting Data Breach, and the harms suffered by Plaintiff and the Class.

100. As a direct consequence of Defendants' negligence, Plaintiff and Class Members have experienced — and will continue to experience — a heightened threat of identity theft, financial fraud, emotional distress, loss of privacy, property-value diminution in their PII, loss of control over personal data, and significant time and monetary expenses to mitigate risks and repair the damage caused..

101. Defendants' conduct was reckless, willful, and in conscious disregard for consumer safety. The foreseeability of a cyberattack, combined with the sensitivity of the PII collected and Defendants' failure to act, warrants an award of punitive damages.

102. As a result, Plaintiff and Class Members are entitled to monetary relief, including funds sufficient to provide robust, long-term identity-protection services, as well as injunctive relief requiring Defendants to implement and maintain adequate cybersecurity measures going forward.

## SECOND CAUSE OF ACTION

**Breach of Contract**

***(On Behalf of Plaintiff and the Nationwide Class)***

103. Plaintiff incorporates the above allegations as if fully set forth herein.

104. Plaintiff and Class Members entered into contractual relationships with Defendants when they paid for and utilized Defendants' lending and investment services, which included the implicit and explicit promise that Defendants would protect the confidentiality and security of their PII.

105. Defendants' Privacy Policy delineates Defendants' obligations regarding the handling and protection of consumers' sensitive information and forms an integral part of the parties' agreement governing the provision of services.

106. Through that Privacy Policy, Defendants expressly represented that they would safeguard customers' personal data and restrict disclosure of such information except under narrowly defined circumstances, thereby creating binding contractual duties concerning data privacy and security.

107. Plaintiff and Class Members satisfied all of their contractual obligations by providing accurate information and paying for or otherwise utilizing the services as agreed.

108. Defendants breached their contractual promises by failing to adequately secure and protect Plaintiff's and Class Members' PII, resulting in the Data Breach and exposure of confidential information to unauthorized actors.

109. By permitting cybercriminals to gain access to, copy, and exfiltrate sensitive data without consent or authorization, Defendants violated both their contractual commitments and the privacy assurances contained in their Privacy Policy.

110. Defendants' failures, including their noncompliance with federal guidance and established industry security standards, deprived Plaintiff and Class Members of the full value of the services for which they bargained, resulting in an inferior product worth less than what was represented.

111. As a result of Defendants' breach, Plaintiff and Class Members suffered harms including the loss of privacy, diminution of the value of their PII, and exposure to an ongoing risk of identity theft and fraudulent activity, as detailed throughout this Complaint.

112. Defendants' misconduct was the direct and proximate cause of Plaintiff's and Class Members' damages, and they will continue to sustain additional losses as the risks associated with the Data Breach persist.

113. Plaintiff and Class Members are entitled to all available remedies for breach of contract, including monetary damages and equitable relief requiring Defendants to implement enhanced cybersecurity safeguards, conduct routine security audits, and provide extended identity-theft protection services at Defendants' expense.

## THIRD CAUSE OF ACTION

**Breach of Implied Contract**

***(On Behalf of Plaintiff and the Nationwide Class)***

114. Plaintiff incorporates the above allegations as if fully set forth herein.

115. This claim is pleaded in the alternative to Plaintiff's Count II, breach of contract claim.

116. Through the parties' interactions and dealings, an implied agreement arose whereby Defendants promised to employ appropriate data-security safeguards to protect Plaintiff's and Class Members' confidential information against unauthorized access and disclosure.

117. Defendants routinely collected Private Information from Plaintiff and Class Members as part of their standard business operations, requiring individuals to disclose sensitive data in order to access Defendants' services. By providing that information, Plaintiff and Class Members accepted Defendants' representations and entered into a relationship in which Defendants assumed responsibilities relating to the privacy and protection of their data.

118. By becoming customers of Defendants and supplying their sensitive personal information as required, Plaintiff and Class Members entrusted Defendants with confidential data that they could not protect once in Defendants' possession. In doing so, the parties formed implied agreements under which Defendants were obligated to maintain the confidentiality and security of that information and to promptly provide accurate notice in the event it was accessed or compromised by unauthorized actors.

119. By providing their Private Information to Defendants with the understanding that it would be protected, Plaintiff and Class Members mutually assented to an agreement with Defendants. Defendants' acceptance of that information, combined with its representations concerning data security, created a meeting of the minds that included Defendants' obligation to safeguard the confidential information entrusted to it.

120. Plaintiff and Class Members satisfied their responsibilities under the implied contracts by providing the required information and utilizing Defendants' services as intended.

121. Defendants violated the implied agreements with Plaintiff and Class Members by failing to implement adequate measures to secure their Private Information and by neglecting to provide prompt and accurate notification once that information was accessed and taken during the Data Breach.

122. As a direct and proximate consequence of Defendants' breach of the implied contracts, Plaintiff and Class Members have sustained, and will continue to sustain, multiple forms of harm, including: (i) a heightened and ongoing risk of identity theft, financial fraud, and related abuse resulting in tangible economic losses; (ii) actual instances of unauthorized financial activity; (iii) loss of privacy and confidentiality over their sensitive personal data; (iv) exposure of their information to illicit sale and trafficking on dark-web platforms; (v) substantial time spent addressing and mitigating the fallout from the Data Breach; and (vi) additional economic and noneconomic injuries that will persist into the future.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

***(On Behalf of Plaintiff and the Nationwide Class)***

123. Plaintiff incorporates the above allegations as if fully set forth herein.

124. This claim is asserted in the alternative to Plaintiff's contract-based claims.

125. Defendants received monetary payments and other valuable benefits from Plaintiff and Class Members in connection with their use of Defendants' lending and investment services. Defendants also derived value from the PII that Plaintiff and Class Members were required to provide in order to participate in those services.

126. In providing their sensitive data and paying for Defendant's services, Plaintiff and Class Members reasonably expected that Defendants would use part of those funds and resources to implement robust measures to protect the confidentiality and security of their PII.

127. Defendants failed to employ adequate security practices and instead retained the benefits conferred upon them without delivering the level of protection promised and required. Defendants' conduct resulted in Plaintiff and Class Members receiving services of diminished value.

128. Defendants unjustly retained the economic value derived from Plaintiff's and Class Members' PII, including but not limited to: (i) operational advantages gained from possessing and processing that data; (ii) the ability to market and grow its business through data-driven services; and (iii) revenue obtained from Plaintiff and Class Members while failing to safeguard their information.

129. Defendants' retention of the benefits conferred by Plaintiff and Class Members is inequitable under the circumstances, because Defendants failed to implement and maintain reasonable security protocols and allowed highly sensitive data to be exfiltrated by cybercriminals.

130. As a result, Plaintiff and Class Members have suffered economic harm, loss of privacy, and the continuing threat of identity theft and fraud — consequences directly attributable to Defendants' failure to properly use the benefits it received for data-protection purposes.

131. Defendants should be required to disgorge, for the benefit of Plaintiff and the Class, the monetary value of the benefits they unjustly obtained and retained at the expense of Plaintiff and Class Members, including the portion of revenue that should have been allocated to adequate cybersecurity measures.

## FIFTH CAUSE OF ACTION

### Injunctive/Declaratory Relief

***(On Behalf of Plaintiff and the Nationwide Class)***

132. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

133. Defendants owe a duty of care to Plaintiff and Class Members, which required Defendants to implement and maintain reasonable security measures to protect the PII entrusted to them by Plaintiff and Class Members.

134. Defendants and their agents continue to retain possession and control of Plaintiff's and Class Members' PII and therefore remain responsible for safeguarding it against further unauthorized access or misuse.

135. As a result of the Data Breach, an actual controversy exists concerning whether Defendants are now meeting their legal obligations to properly secure the PII of Plaintiff and the Class. Plaintiff alleges that Defendants' current cybersecurity posture remains deficient, leaving Plaintiff and Class Members exposed to ongoing and future harm. Because the PII has already been compromised, the risks associated with inadequate security safeguards are not hypothetical or speculative.

136. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants have a legal duty to implement and maintain reasonable cybersecurity measures consistent with common law standards and Section 5 of the FTC Act to protect the PII in their custody;

b. Defendants breached their duty to Plaintiff and the Class by failing to prevent the Data Breach;

c. Defendants' present data-security protocols remain insufficient to protect Plaintiff and Class Members from further unauthorized access or cyberattacks; and

d. The ongoing inadequacy of Defendants' security practices continues to cause harm and heightened risk of injury to Plaintiff and the Class.

137. Absent injunctive relief, Plaintiff and Class Members will continue to be at substantial and imminent risk of repeated identity theft, fraud, and other misuse of their sensitive personal information. The continuing threat of future harm cannot be remedied solely through monetary damages.

138. The balance of hardships weighs decisively in favor of granting injunctive relief. Protecting millions of individuals from additional identity-related injuries vastly outweighs any

financial or administrative burden imposed on Defendants — who are already legally obligated to implement reasonable cybersecurity controls.

139. Finally, an injunction requiring Defendants to adopt and maintain proper data-security safeguards advances the public interest by reducing future cyber threats, deterring similar misconduct, and promoting the security of consumer financial information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully requests the following relief:

A. Certifying this action as a class action under Fed. R. Civ. P. 23 and appointing Plaintiff and her counsel to represent the Class;

B. Entering judgment for Plaintiff and the Class;

C. Granting permanent and appropriate injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to adequately safeguard the PII of Plaintiff, and the Class, by implementing improved security controls;

D. Awarding compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

E. Award Plaintiff and the Class statutory or punitive damages as allowed by law in an amount to be determined at trial;

F. Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

G. Awarding to Plaintiff and the Class the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H. Awarding pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper; and

I. Granting such further and other relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: December 10, 2025

**CASEY GERRY FRANCAVILLA BLATT LLP**

*/s/ David S. Casey, Jr.*
David S. Casey, Jr., SBN 060768
Gayle M. Blatt, SBN 122048
P. Camille Guerra, SBN 326546
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
dcasey@cglaw.com
gmb@cglaw.com
camille@cglaw.com

*Counsel for Plaintiff and the Proposed Class*